UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Jennifer Pardo and Evangeline Matthews,

individually and on behalf of all others

similarly situated,

Plaintiffs,

vs.

PAPA, Inc.,

Defendant.

Case No.: 3:21-cv-06326-RS

**DECLARATION OF ALISON T. ROSE**

**Table of Contents**

I.   QUALIFICATIONS .......................................................................................... 2

II.  ASSIGNMENT ............................................................................................... 2

III. AVAILABLE DATA AND DOCUMENTS ......................................................... 2

IV.  INTRODUCTION ............................................................................................ 5

V.   BUSINESS EXPENSES ..................................................................................... 7

   A. Cell Phone and Internet-related expenses are likely to vary among Pals and depend on several individualized factors ................................................................................... 7

   B. Many Pals never conduct a visit requiring a vehicle ........................................ 9

   C. The vehicles listed in the Vehicle data by Pals vary by Year, Make and Model with many reporting incomplete information or listing multiple vehicles .......................... 10

   D. The IRS rate likely overstates the actual costs for many Pals, particularly for those driving older vehicles. ............................................................................................... 14

   E. The IRS rate overstates costs for older vehicles, particularly with respect to depreciation. ............................................................................................................. 15

   F. Edmunds.com True-Cost-to-Own data shows variation in per miles costs across different Make, Model, Year combinations. ............................................................... 18

VI.  HOURS WORKED ........................................................................................ 24

   A. The data demonstrates variation in the types of tasks performed by Pals ................. 24

   B. The data shows that most Pals complete very few visits ................................. 38

   C. The data shows that not all scheduled visits were started and Pals did not record an end time for all started visits ................................................................................... 39

   D. Comparison of the Scheduled to Actual Durations indicate that scheduled time does not reliably reflect actual visit durations. ............................................................... 39

   E. The data demonstrates that many Pals are unlikely to have worked overtime hours, either on a daily or weekly basis ........................................................................... 45

   F. The available data likely does not include information sufficient to estimate all work-related activities alleged by Plaintiffs ........................................................................ 47

1

## I.  QUALIFICATIONS

1.      I am a Partner at Resolution Economics LLC, a firm whose activities include performing economic and statistical analyses in connection with litigation matters.  At Resolution Economics, I have provided consulting and/or expert services in more than 200 class-action and single-plaintiff matters alleging wage and hour violations under the FLSA and/or analogous state laws.  I hold B.A. and M.A. degrees in Economics from the University of Southern California and an M.A. in Survey Research from the University of Connecticut.  I have been designated as an expert in a number of matters, prepared expert reports, and have provided expert testimony in Federal and State Courts, and arbitrations.  My resume and list of testimony provided during the past four years are attached to this report as Attachment A.  My hourly rate for all services rendered is $750, which is the rate I customarily charge for both consulting work and expert testimony.

## II.  ASSIGNMENT

2.      I have been retained by counsel to defendant Papa, Inc. ("Papa") to review data, and other case documents regarding the experiences and activities of the Pals who provide services to Papa's members relative to Plaintiff's Motion for Class Certification.  In connection with this assessment, I will address: 1) Whether the available data provides sufficient information in order to derive reliable measures of expenses incurred by Pals; 2) Whether the IRS rate can be used to reliably determine vehicle-related expenses; 3) Whether the data shows variation in the types of and durations of visits conducted; and 4) Whether the data provides sufficient information in order to be able to reliably compute hours worked.

## III.  AVAILABLE DATA AND DOCUMENTS

3.      In connection with this assignment, I have received and analyzed a number of electronic records as well as case filings and associated exhibits.[1]

---

[1] A complete list of data and documents reviewed is provided as an attachment to this declaration.

4.    **Pals List** – This data contains a list of 3,872 unique Pal ID's corresponding to individuals who provide services to customers through the Papa app in California during the period August 12, 2018 through May 1, 2024. This data includes three columns, the Pal ID, Status, and Date of Move. Pal ID is a unique identifier for Pals. The status can either be "Movers" or "Still residing".  If their status is "Movers" then the column Date of Move is populated with a date ranging from October 6, 2020 to August 25, 2021.

5.    **Vehicle Data** –The Vehicle Data includes 3,569 records for 3,127 unique Pal IDs. The relevant fields also include the Make, Color, Year, and Model of the vehicle in question. Additional fields of Creator ID, Inserted At and Updated At describe who created the record and when the record was created or updated. The "Inserted At" field includes dates from 07/26/2019 to September 3, 2024. Within the Vehicle Data, some vehicles appear to be repeated. The unique combination of Pal ID, Make, Color, Year, and Model was considered to be a unique vehicle based on the assumption that no Pals shared a single vehicle. In total, 3,437 unique vehicles are listed in the data.[2]

6.    **Visit Data** – The visit data includes 253,925 records for each scheduled visit, each being unique by the Visit ID. The data also includes 3,871 unique Pals that performed the visits. The relevant fields also include a Papa ID, whether the visit was virtual or not, commute distance, scheduled duration of visit in minutes ("Duration Minutes"), the observed duration of the visit in minutes ("Observed Duration Minutes"), the override duration in minutes ("Override Duration Minutes"), the state of the visit, timestamp and date for when the commute started,

_____

[2] Some vehicle records appeared to have incomplete information, i.e. missing Make, Model, Year or Color. The Make field was unrecorded for 1,326 vehicles, the Model field was unrecorded for 243 vehicles, the Year field was unrecorded for 276 vehicles, and the Color field was unrecorded for 262 vehicles. For the purpose of analyzing the data, the Make field was populated based on data from the Model field when possible. For example, some Model fields included a Make such as "Toyota Camry". In other cases the Make could be determined based on the Model. For example, if the Model was "Accord" then the Make was considered to be "Honda". In this manner, the Make field was populated for 875 vehicles with unrecorded Make fields. The remaining 451 Make fields were considered as "blank".

DECLARATION OF ALISON T. ROSE

timestamp and date for when the visit was scheduled for, timestamp and date for when the visit started, timestamp and date for when the visit was completed. Papa ID pertains to the customer who is serviced by the visit. The state of the visit has possible values of "accepted", "completed", "confirmed", "enroute", "expired", "reviewed", "started", and "terminated". The visits data includes visits from before the statute of limitations and from planned for the future hence the data ranges from February 6, 2018 to December 31, 2024, but the last visit that was started and completed appears on Septebmer 12, 2024.[3] A total of 252,987 visits occurred between August 12, 2018 and September 12, 2024.

7.     **Task Data** –The task data includes 1,246,177 records reflecting each task that Pals performed during visits. The data includes 253,925 unique Visit IDs, which correspond to the Visit IDs in the Visit Data. The relevant fields also include the Task Name, Visit Objective Description, Visit Objective Information, Visit Task Inserted at, Whether the Task Required a Vehicle, and if the Visit Objective was Checked. The "Visit Task Inserted At" presents the time when the record for the Visit Task was created or updated rather than the time that the Visit Task occurred. The Visit Task Insert At timestamps in this dataset range from April 10, 2019 to September 12, 2024.[4]

8.     **App Data** - The app data includes 49,981,610 records each and shows times stamps for various activities recorded by the Papa app. This data includes the Pal ID, Visit ID, the action that the actor (Pal or Other) took in the app (event), event description, timestamp and date of the app action, and the event source. The app data ranges from February 6, 2018 to September 13, 2024. Examples of the event descriptions include "Application Opened", "Visit Screen Viewed", "Available Visits List Viewed", and "Visit Accepted".[5]

---

[3] These visits reflect all visits for Pals active through May 1, 2024. One visit in the visits data has a commute that started on Sept 5, 1989. The data appears to have been pulled up to 9/12/2024, which would be the last day with visits worked.
[4] 209,182 / 253,925 of visits (82.4%) have a Visit Task Insert At timestamp before the visit and 44,732 / 253,925 of visits (17.6%), the earliest Visit Task Insert At timestamp is during or after the Visit.
[5] Only a single time stamp is recorded with each event rather than a set of time stamps from which a duration could be computed. Multiple events can share the same time stamp.

4

## IV.  INTRODUCTION

9.      Plaintiffs' Motion for Class Certification seeks certification of a group of individuals referred to as "Pals" who provided services as independent contractors to customers through the Papa app from August 12, 2018 to present.[6]  In connection with their allegation that Pals were misclassified as independent contractors, Plaintiffs allege that Papa failed to pay minimum wage and overtime, failed to provide meal and rest breaks, and failed to reimburse for necessary business expenses.[7]  Their trial plan appears to be limited to a footnote where they describe a phased proceeding where the misclassification issue would be determined first and then liability for the remaining claims would be resolved in a separate phase.[8]  In this brief description of the proposed process, they note that the second phase would include "expert and/or representative testimony".[9]  However, Plaintiffs present no analysis indicating 1) How they intend to manage individualized issues with respect to incurred expenses; 2) How they intend to demonstrate failure to pay minimum wage and/or overtime; or 3) How they intend to demonstrate failure to provide meal and rest breaks.  With respect to each of these items, the available data suggests that individualized inquiry may be required to determine liability and subsequent damages, if any.

10.     First, the data I have reviewed is insufficient for making determinations about expenses incurred by Pals.  As described in detail below, vehicle, phone and internet expenses are likely to be highly individualized.  First, phone and internet costs will vary by Pal based on what service provide and plan they selected.  For example, if a Pal's cell phone is part of a family plan, the question of how to allocate expenses to their line have not been addressed by Plaintiffs.  Plaintiffs have also failed to specify how internet expense should be computed if a Pal is using public or otherwise free Wi-Fi to conduct a visit or other alleged work-activities.  The analysis of expenses could be further complicated if Pals also perform work for other app-based

---

[6] Plaintiffs' Motion for Class Certification; page 2.
[7] Plaintiffs' Motion for Class Certification; page 11.
[8] Plaintiffs' Motion for Class Certification; page 25, footnote 60
[9] Ibid.

1  companies (i.e. whether they are also running Uber, Lyft, Instacart, or other applications on their

2  phone that are using data at the same time they are running the Papa app), and how any costs for

3  that time should be allocated to Papa.

4

5  11.      With respect to vehicle expenses, while Plaintiffs make mention of using the IRS rate

6  as a comparator to what Papa used when it did reimburse Pals for some mileage expenses,[10] they

7  have not presented any plan for how to determine what expenses Pals actually incurred with

8  regard to mileage.  Further, many Pals either do not have a vehicle recorded in the Papa system

9  or do not conduct any visits that required a vehicle.  As described below, the IRS rate is not

10  likely to be a reliable measure of actual vehicle expenses and will overstate the true expenses

11  incurred for many Pals based on the make, model and year of the vehicle they operated while

12  conducting visits.  Further, the data also demonstrates that the 45 cents per mile reimbursement

13  received likely over-reimbursed many Pals related to their actual expenses.[11]

14

15  12.      In order to analyze issues related to minimum wage, overtime, and breaks, a measure

16  of hours worked will be required.  As described in detail below, the data I have reviewed is

17  insufficient to determine hours spent outside of completing a visit and in fact, frequently

18  demonstrates that Pals do not record the end time of started visits which leads to incomplete

19  information about visit duration.  To the extent Plaintiffs would propose using the apps data to

20  compute hours worked, the single time stamp per event does not allow for a duration to be

21  computed from the data itself and would require additional information.  In addition, Plaintiffs

22  have not provided a proposed method for identifying and quantifying alleged work-related

23  activities that occur outside of the app such as orientation and training.  Finally, the data

24  demonstrates variation in the types and duration of visits and recorded visit times suggest many

25

26

27

28

---

[10] Plaintiffs' Motion for Class Certification; page 23

[11] See JP000333 listing $0.45 per mile reimbursement for Transportation Pay.  "You are paid for miles you travel during a visit, whether with or without the member.  For example, when you drive a Papa member to the pharmacy or grocery store or the member asks you to drive and drop off a package."

6

Pals are unlikely to have worked overtime hours or to have been eligible for meal and rest breaks.

## V.    BUSINESS EXPENSES

### A.    Cell Phone and Internet-related expenses are likely to vary among Pals and depend on several individualized factors

13.    Plaintiffs' Motion for Class Certification does not propose a methodology for determining the amounts for phone and/or internet expenses incurred by Pals.  These expenses are likely to be highly individualized depending on the service provider and plan selected. According to the California Public Utilities Commission, there are 11 cellular carriers operating in California:

- AT&T Mobility
- Boost Mobile
- Gen Mobile
- Metro by T-Mobile
- METROPCS
- Republic Wireless
- Ting Mobile
- T-Mobile
- Twigby
- UScellular
- Verizon Wireless[12]

Each of these providers offers a number of service plans at various price points.  For example, T-Mobile's website lists a number of single phone line plans for a new customer ranging from $50 per month for an "Essentials Saver" plan to $100 per month for a Go5G Next plan, with others

---

[12] See https://apps.cpuc.ca.gov/apex/f?p=102:1::::RP:: limited to Utility Type = "CEC".
Accessed 9/25/2024

available at $60, $75, or $90 per month.[13]  On their website Verizon lists three available single line phone plans for new customers including $65 per month for an "Unlimited Welcome" plan, $80 per month for an "Unlimited Plus" plan and $90 per month for an "Unlimited Ultimate" plan.[14]  On Twigby's website, they offer 4 plans ranging from $5 per month to $25 per month for new customers.[15]  These examples demonstrate the range of available prices across and within cell phone providers for a single line plan.  Just for these three of eleven providers, a single line phone plan could range from $5 per month at Twigby to $100 per month at T-Mobile.  Further, these companies likely offer different pricing per line depending on the number of lines added to the plan. For example, Verizon's "Unlimited Ultimate" plan decreases from $90 for a single line plan to $52 per line for a 5+ line plan.[16]  Thus, in order to determine actual cell phone and data expenses incurred by a Pal, detailed individualized inquiry regarding their cell phone plan would likely be required.  The variation in available plans and the associated costs also suggests that using an average from a group of Pals called to testify about their expenses would likely result in large over- or understatement of their actual monthly expenses.

14.     However, even if each Pal's monthly cell phone bills were available, that detailed information would still be insufficient for determining their actual expenses as it is unlikely that Pals have a cell phone and separate plan dedicated only to their work as a Pal.  Thus, the *pro rata* share of their monthly bill attributable to performing services as a Pal would also need to be determined.  This would include considerations for features of their plan inapplicable to providing services to Papa and what portion of the time the Pal uses the phone and data plan for performing services for Papa versus personal or other use.  For example, if a Pal added an international data plan to their line for a vacation abroad, this charge would need to be subtracted before apportioning the remainder of the bill between use for providing services to Papa and personal or other use.

[13] https://www.t-mobile.com/cell-phone-plans  Accessed 9/25/2024.
[14] https://www.verizon.com/sales/nextgen/plans/popularplan.html?line=newLine1&mtnFlow=P Accessed 9/25/2024, 90045 zip code.
[15] https://www.twigby.com/page/howitworks Accessed 9/25/2023 These rates increase by $10 per month after the first 3 months.
[16] Ibid.

8

1

2      15.      Plaintiffs have also failed to identify what they allege constitutes reimbursable use of a

3      Pal's cell phone. For example, they have not indicated if any use of the app would constitute a

4      reimbursable activity or if it would only apply when a visit was being conducted.  If they were to

5      allege the former, for example, this creates an additional layer of complication in determining the

6      appropriate *pro rata* share of the bill attributable to providing services as a Pal if the Pal uses

7      other apps to perform services for other companies such as Uber, Lyft, Instacart, Door-Dash, etc.

8      and utilizes the Papa app simultaneously.  For example, if they provide Uber or Lyft rides in

9      between Papa visits while still logged into the Papa app, additional individualized inquiry would

10     be required to determine the correct allocation of their phone costs.[17]

11

12                    **B.      Many Pals never conduct a visit requiring a vehicle**

13     16.      The visits data indicates that many visits can be conducted without the use of a vehicle

14     or can be conducted virtually.  In-person visits that would not require a person to have their own

15     vehicle include companionship, exercise, house tasks, pet help, etc.  Virtual visits include,

16     among others, companionship, reminders, tech help.  Of the 155,133 completed visits in the data,

17     131,117, or 84.5% note that a vehicle is not required.[18]  Of the 3,849 pals who completed a visit,

18     2,056, or 53.4% never conducted a visit that requires the use of a vehicle.  Thus, these Pals

19     would not have been expected to incur any mileage costs.[19]

20

21

22

23     ―――――――――――――

24     [17] For example, Pal Kellie Hynds reported in her declaration that she also performs work for Uber
       Eats. (See Declaration of Kellie Hynds; paragraph 9).  Pal Nancy Gonzales stated in her

25     declaration that she also performs work for Uber and Lyft, even on the same days she performs
       work as a Pal. (See Declaration of Nancy Gonzales; paragraph 8).

26     [18] A "completed" visit is any visit where the data indicates the visit was conducted meaning a
       start time was recorded or some duration is credited to the Pal. This would not include cancelled

27     visits.
       [19] It is my understanding that commute to and from the Papa member's location for a visit would

28     not constitute reimbursable mileage if Papa is found to have misclassified them as independent
       contractors.

### C. The vehicles listed in the Vehicle data by Pals vary by Year, Make and Model with many reporting incomplete information or listing multiple vehicles

17.     The available data includes 3,437 unique Year, Make, Model and color combinations recorded in the Papa Vehicle data by 3,127 Pals. Excluding color from the detail, there are 3,436 unique Year, Make, Model combinations listed.[20] Some pals list a single vehicle (Year, Make, Model, Color combination) in the app while others list up to four. Complicating the assessment of actual vehicle expenses are the 7.49% of Pals who list two or more vehicles in the Vehicle data because the data does not indicate which vehicle was used for which visit. Thus, to the extent that actual costs vary by vehicle, determining actual expenses would likely require individualized visit-by-visit inquiry regarding which vehicle was used. For example, Pal ID 01764d32-8d40-45f5-bce6-93854ee093bf recorded a 2005 Ford Mustang and a 2019 Chevy Cruze in the Vehicle data. According to the U.S. Department of Energy, a 2005 Ford Mustang can be expected to achieve a combined city/highway gas mileage of 19 miles per gallon[21] while a 2019 Chevy Cruze is expected to achieve a combined city/highway mileage rating of 33 miles per gallon.[22] Even if no other vehicle-related costs varied (including depreciation, maintenance and repairs, etc.), this Pal would be expected to incur very different fuel costs depending on which vehicle they used to conduct a given visit.

---

[20] As noted below, trim and features also impact the cost to own according to Edmunds.com and are not recorded in the Vehicle data. For example, the cost to operate a 2018 Toyota Prius with Trim "Four Touring 4dr Hatchback 1.8L 4cyl gas/electric hybrid CVT" will differ from a 2018 Toyota Prius with Trim "Two Eco 4dr Hatchback 1.8L 4cyl gas/electric hybrid CVT". See https://www.edmunds.com/toyota/prius/2018/cost-to-own/?style=401741152

[21] Assuming a 4.0 L, 6 cyl Automatic 5-spd. See https://www.fueleconomy.gov/feg/PowerSearch.do?action=noform&path=1&year1=2005&year2=2005&make=Ford&baseModel=Mustang&srchtyp=ymm&pageno=1&rowLimit=50 Accessed 9/25/2024.

[22] Assuming a 1.4 L, 4 cyl Automatic (variable gear ratios, Turbo, Regular Gasoline See https://www.fueleconomy.gov/feg/PowerSearch.do?action=noform&path=1&year1=2019&year2=2019&make=Chevrolet&baseModel=Cruze&srchtyp=ymm&pageno=1&rowLimit=50 Accessed 9/25/2024.

1  18.   Exhibit 1 presents the distribution of the number of vehicles listed in the Vehicle data
2  per Pal.[23]   As shown on Exhibit 1, 19.24% of Pals have no vehicles listed, 73.27% have a single
3  vehicle listed and 7.49% have two or more vehicles listed in the Vehicle data.

**Exhibit 1: Distribution of the Number of Vehicles Recorded by Pals in the Vehicle data**



19.   As discussed in detail below, publicly available sources for the cost to own and
operate a vehicle rely, in part, on the Year, Make and Model of the vehicle.  Thus, in order to
assess cost, these components would certainly be needed.  However, these details are incomplete
for many vehicles listed by Pals in the Vehicle data.  While some were able to be filled (for
example, if an Accord was listed with no Make, one can reasonably assume the Make is
"Honda"), others cannot be identified without more information.  For example, Pal ID
00b6a4bb-dc82-4afd-9f0c-f9fe8321ad80 has one record for a 2020 Honda Accord and a second
record just stating "Honda".  It is unclear if this was a second record for the same 2020 Accord

---

[23] This includes those with incomplete information listed.

or a different Model and Year.  Another Pal, ID 9eeedfd9-7749-4ddf-8133-725b48db6967, listed a single car in the app with no Make, the word "Model" in the Model field, 2000 as the year and the word "Color" in the Color field. Clearly, in order to determine what the vehicle costs were for these vehicles would require additional information about the actual Year, Make or Model.

20.     First, the data shows variation in Model Year of the Pal's vehicles.  Exhibit 2 presents a distribution of the recorded Model Years in the Vehicle data, showing years listed from 1990 to 2024, a spread of 34 years.

**Exhibit 2: Distribution of the Vehicle Model Years Recorded by Pals in the Vehicle data[24]**



---

[24] Model Year "0" indicates a record without missing value for Model Year. The value "2000" for Model Year also appeared in records where Make was unlisted and the Model value was simply "Model".

1

2    21.    In addition to variation in Model Year, the vehicles recorded in the Vehicle data

3    include 33 unique Makes, as well as some "Blank" entries indicating that a Year, Model or Color

4    was listed but Make was left blank in the data.  The frequency distribution of recorded Makes is

5    presented on Exhibit 3.  As shown on this exhibit, 16.58% of vehicles recorded have no listed

6    Make ("BLANK").  The most common Make is Toyota (17.5%), followed by Honda (12.0%),

7    and Nissan (8.4%).  The value "Other" is also recorded in the data for 3.5% of listed vehicles.

8

9    **Exhibit 3: Distribution of the Vehicle Makes Recorded by Pals in the Vehicle data**



**D.** **The IRS rate likely overstates the actual costs for many Pals, particularly for those driving older vehicles.**

22.     In their motion, Plaintiffs mention the IRS rate as a comparator to the 45 cents per mile rate that Pals were reimbursed for mileage by Papa as Transportation Pay.[25]  However, publicly available information suggests that the IRS rate, used for tax deduction purposes, will not reliably reflect the actual per mile expenses incurred by Pals.  IRS publications confirm that the IRS rate is not intended to be a measure of actual expenses for operating any particular vehicle but instead show that the business standard mileage rate is intended for tax purposes. The IRS publications state the mileage rates are, "optional standard mileage rates for computing the deductible costs of operating an automobile for business, medical, or moving expense purposes and for determining the reimbursed amount of these expenses that is deemed substantiated."[26]  The IRS provides three rates based on what type of activities are performed. For example, the 2018 deduction rate for self-employed/business use was 54.5 cents per mile. However, driving for medical appointments and military moving had a tax deduction rate of 18 cents per mile and driving on behalf of charities had a tax deduction rate of just 14 cents per mile.[27]

23.     Since 1980, MOTUS (or its previous affiliate Runzheimer International) has provided the underlying data to the IRS for purposes of computing the mileage reimbursement rates.[28]  The former CEO of MOTUS, Craig Powell, described the IRS rate as a safe harbor rate. He stated, "The IRS business mileage standard is a go-to reimbursement method for many businesses and individuals, but it actually wasn't intended to be a reimbursement rate.  It was established as a watermark that companies can't reimburse over without incurring taxes or

---

[25] Plaintiffs' Motion for Class Certification; page 23.
[26] https://www.irs.gov/tax-professionals/standard-mileage-rates
[27] https://www.irs.gov/tax-professionals/standard-mileage-rates
[28] See https://www.motus.com/blog/2024-irs-standard-mileage-rate/#:~:text=On%20December%2014th%2C%202023%2C%20the,65.5%20cents%20by%201.5%20cents.  Accessed 8/14/2024.

14

defensibly demonstrating the business expense above the safe harbor rate."[29]  Similarly, in a press release from Runzheimer dated December 13, 2016, Runzheimer SVP of Business Development, Donna Koppensteiner, also referred to the IRS rate as a safe harbor.  She states, "Factors contributing to the decision on this year's slight decrease in the Safe Harbor reimbursement rate include declining fuel prices, which were largely offset by rising vehicle insurance and maintenance costs."[30]  She went on to say, "The IRS safe harbor rate establishes a standard rate on the amount an individual can deduct for business vehicle expenses.  The IRS uses our research, data and recommendation to construct an accurate standard mileage rate."[31]

**E.**      **The IRS rate overstates costs for older vehicles, particularly with respect to depreciation.**

24.      The IRS rate includes depreciation, which means that it will overstate the true cost to operate older vehicles because depreciation happens rapidly in the first few years after first being purchased as new compared to later years.  While the IRS does not provide a detailed breakdown of each underlying component of its mileage reimbursement rates, it does provide information on the value of depreciation.  Documentation provided by MOTUS to the IRS in March 2019 states that the IRS computes depreciation as "the average annual decrease in vehicle value from the time it was new until the end of the program retention cycle."[32]  In this regard, I am familiar with the decision of the Sixth Circuit Court of Appeals in *Parker v. Battle Creek Pizza*, which concluded that  "the estimation of depreciation costs in the IRS rate is weighted toward newer vehicles, which tends to overpay drivers of older vehicles."[33]  This is an accurate statement.  Exhibit 4 below provides a breakdown of the IRS mileage rate for tax

[29] https://www.businesswire.com/news/home/20191231005180/en/2020-IRS-Business-Mileage-Rate-of-57.5-Cents-Informed-by-Motus-Cost-Data-and-Analysis  Accessed 8/12/2024
[30] https://www.prnewswire.com/news-releases/runzheimer-data-sets-2017-irs-business-mileage-rate-at-535-cents-300377426.html  Accessed 8/12/2024
[31] https://www.prnewswire.com/news-releases/runzheimer-data-sets-2017-irs-business-mileage-rate-at-535-cents-300377426.html  Accessed 8/12/2024.
[32] See https://www.governmentattic.org/33docs/IRSrunzheimerVehMileageCosts_2018.pdf, page 15 "Annual Vehicle Cost".  Accessed 8/20/2024.
[33] *Parker v. Battle Creek Pizza, Inc.*, No. 22-2119 (6th Cir. 2024); page 9

purposes showing the total rate, the portion of the rate that is depreciation and the percentage of the rate that is depreciation. As shown on Exhibit 4, depreciation as a percentage of the total rate ranges from 41.6% to 47.0%.

**Exhibit 4: Summary of the IRS Business Standard Mileage Rate and the Portion of that Rate Due to Depreciation**[34]

| Year | IRS Rate (cents per mile) | Depreciation (cents per mile) | Depreciation as a Percent of the IRS Rate |
|---|---|---|---|
| 2018 | 54.5 | 25 | 45.87% |
| 2019 | 58 | 26 | 44.83% |
| 2020 | 57.5 | 27 | 46.96% |
| 2021 | 56 | 26 | 46.43% |
| 1/1/2022-6/30/2022 | 58.5 | 26 | 44.44% |
| 7/1/2022-12/31/2022 | 62.5 | 26 | 41.60% |
| 2023 | 65.5 | 28 | 42.75% |
| 2024 | 67 | 30 | 44.78% |

25.     What is important to note about the depreciation for tax purposes is that after 6 years, almost the entire car is depreciated. IRS Publication 463 provides the following explanation of depreciation for tax purposes:

---

[34] https://www.irs.gov/tax-professionals/standard-mileage-rates Accessed 8/12/2024.

"Example. In 2018, you bought and placed in service a car for exclusive use in your business. The car cost $25,500. From 2018 through 2023, you used the standard mileage rate to figure your car expense deduction. You drove your car 14,100 miles in 2018, 16,300 miles in 2019, 15,600 miles in 2020, 16,700 miles in 2021, 15,100 miles in 2022, and 14,900 miles in 2023. The depreciation portion of your car expense deduction is figured as follows:

| Year | Miles | Rate Depreciation | Depreciation Amount |
| --- | --- | --- | --- |
| 2018 | 14,100 | $0.25 | $3,525 |
| 2019 | 16,300 | $0.26 | $4,238 |
| 2020 | 15,600 | $0.27 | $4,212 |
| 2021 | 16,700 | $0.26 | $4,342 |
| 2022 | 15,100 | $0.26 | $3,926 |
| 2023 | 14,900 | $0.28 | $4,172 |
| **Total Depreciation`** | | | **$24,415** |

At the end of 2023, your adjusted basis in the car is $1,085 ($25,500 − $24,415)."[35]

26.       There are two key takeaways from the IRS's explanation of depreciation.  First, the value of the vehicle will be close to zero well before the end of its useful life.  Second, the amount of depreciation a taxpayer can claim on a vehicle is capped.  Once the vehicle is fully depreciated, then taxpayers can no longer claim the depreciation portion of the rate.  Thus, even if one were to apply the IRS rate, then one would have to determine the total mileage of the vehicle to assess whether it was fully depreciated.  If this rule were applied to a 2018 vehicle after it was fully depreciated in 2024, then the mileage rate a Pal could deduct for tax purposes would be 37 cents per mile (the 2024 IRS mileage rate of 67 cents per mile minus 30 cents per mile of depreciation).

27.       Depreciation is a substantial portion of the cost of ownership and of the IRS rate and therefore the amount (if any) of depreciation needs to be considered to determine any Pal's expenses at any given time.  But, given the model years of the Pal's vehicles, the bulk of depreciation is likely to be unrelated to times when they were conducting visits for Papa members.  For example, the most significant depreciation occurs when a new car is driven off a dealer lot.  The loss in value (depreciation) associated with driving the vehicle off the dealer's

---

[35] https://www.irs.gov/pub/irs-pdf/p463.pdf

lot is unrelated to performing services as a Pal. In addition, every year the vehicle is a model year older. Year-over-year depreciation, depreciation due to supply and demand for particular vehicles, or other market factors is also unrelated to using the vehicle to perform visits with Papa members.[36] Finally, some depreciation is due to the condition of the vehicle. For example, going from excellent to good condition reduces resale value and correspondingly increases the depreciation in the vehicle. Since the depreciation expense per mile includes both usage-based depreciation and other types of depreciation, the cost of ownership estimates for depreciation provided by Edmunds overstates the depreciation associated with driving incremental miles conducting visits for Papa members. This illustrates the difficulty of accurately estimating the actual expenses incurred by any Pal.

> **F.** **Edmunds.com True-Cost-to-Own data shows variation in per miles costs across different Make, Model, Year combinations.**

28. Publicly available data published by Edmunds suggests vehicle expenses vary depending on the make, model, year, and mileage of the vehicles used for Pal visits and are consistently below the IRS mileage rate. More specifically, Edmunds' True-Cost-to-Own guide provides the 5-year costs of owning a vehicle including: fuel, insurance, maintenance, repairs, taxes & fees, and depreciation.[37] Edmunds describes its methodology for assessing different categories of expenses as follows:

- **"Taxes & Fees:** This consists of the base sales (or use) taxes, license and registration fees in your state, and gas-guzzler tax if applicable. These taxes and fees are often based on a percentage of the purchase price and generally decrease as the vehicle ages and loses its value. Note: The state sales/use tax rate that we use includes the average local and county taxes assessed at that state.

- **Fuel:** This expense is based on the revised EPA mileage ratings, assuming consumption consists of 45% highway and 55% city driving and that the vehicle is equipped with the transmission that is standard equipment for that vehicle. Cost

---

[36] Depreciation under the IRS rate is capped based on the value of the vehicle and miles driven. Once the tax basis goes to zero, typically in 5 to 6 years for vehicles used in commercial endeavors, then there is no more depreciation allowed for tax purposes. While the tax basis for the vehicle eventually hits $0, the market value is not $0. Thus, the IRS rate does not measure actual depreciation associated with performing work as a Pal.

[37] https://www.edmunds.com/tco.html

18

estimates are based on the current one-year moving average of self-service prices in your state, using regular unleaded gasoline for vehicles whose manufacturers require regular; premium unleaded gasoline for vehicles whose manufacturers recommend or require premium; or diesel fuel for diesel vehicles.

- **Maintenance:** This is the estimated expense of the two types of maintenance: scheduled and unscheduled. Scheduled maintenance is the performance of factory-recommended items at periodic mileage or calendar intervals. Unscheduled maintenance includes wheel alignment and the replacement of items such as the battery, brakes, headlights, hoses, exhaust system parts, taillight/turn signal bulbs, tires and wiper blades/inserts. Estimated tire replacement costs are supplied to Edmunds by The Tire Rack Inc.

- **Repairs:** This is the estimated expense for repairs not covered by the vehicle manufacturer's warranties over the five years from the date of purchase, assuming 15,000 miles are driven annually. We estimate this expense based on the cost of a typical "zero deductible" extended warranty for the vehicle, minus the estimated amount of that cost that consists of the warranty provider's overhead and profit.

- **Insurance:** - This is the estimated average annual insurance premium in your state. The premium has been determined based on annual premium data for defined driver profiles and coverages (liability, comprehensive and collision) from a major national insurer. While this information is specific to vehicle make, model, model year and body type, your personal information is not taken into consideration and could greatly alter the actual premium quoted by an insurer. Factors that will affect your rate include your age, marital status, credit history, driving record, and the garaging address of your vehicle.

- **Depreciation:** This is the amount by which the value of a vehicle declines from its purchase price to its estimated resale value. The purchase price employed is the vehicle's Total Cash Price minus any taxes and fees included in that amount. We estimate the resale value assuming the vehicle will be in "clean" condition, will be driven 15,000 miles per year, and will be sold to a private party." [38]

29.     While financing charges are not included in the IRS mileage rate, some could argue that financing charges should be considered part of an expense rate. Edmunds includes an estimate of financing costs, but does not include information for leases.[39] However, financing

---

[38] See https://www.edmunds.com/tco.html

[39] "**Financing:** This is the interest expense on a loan in the amount of the Total Cash Price, assuming a 10% down payment and a loan term of 60 months. The interest rate used is the prevailing rate that banks and other direct automotive lenders are currently charging consumers in your geographic region who have above-average credit scores." See https://www.edmunds.com/tco.html

costs are individualized because a car may not have been financed at all and because financing is based on personal credit score and down payment/amount financed. Financing costs are unrelated to Papa and are a constant regardless of whether the Pal drives the car while conducting visits for Papa —i.e., financing costs do not incrementally increase with the miles driven while conducting visits.

30.     The Edmunds True-Cost-to-Own guide currently provides estimates for the model years 2018 through 2024 and has inputs for zip code, make, model, year, and "style" before presenting 5-year costs of ownership. The "style" input asks for even more detailed information regarding various options and configurations (based model cars vs. premium trims). Using the guide, one can experiment with plugging in different information regarding vehicle make, model, year, and style to see the different estimates for various categories of vehicle expense, holding zip code constant. This exercise illustrates that vehicle costs vary according to each dimension the True-Cost-to-Own guide captures.

31.     Exhibit 5 presents the estimated per-mile cost to own and operate a Toyota Camry model years 2018 through 2024 in zip code, 95694.[40] The blue bar includes depreciation in the rate while the orange bar is the rate excluding depreciation.[41] As demonstrated on Exhibit 5, holding geography and make and model constant, each model year has a different per-mile cost to operate. Further, in every year the amount of depreciation per mile (the difference between the blue and orange bars) is well below 26 to 30 cents per mile depreciation built into the IRS rate. The reason why the Edmunds depreciation is substantially less than the depreciation built into the IRS mileage rate is that the IRS mileage rate is designed to depreciate the full value of the vehicle for tax purposes while Edmunds' depreciation is a measurement of the loss in value based on the difference between initial purchase price and resale value of the vehicle in 5-years,

---

[40] This is the zip code for Winters, CA where Plaintiff Evangeline Matthews signed her 8/16/2024 declaration. The Toyota Camry was the most commonly recorded Make/Model combination.
[41] As discussed in detail below, many of the older model year vehicles driven by Pals are likely fully depreciated. All costs shown exclude financing.

which is based on a variety of other factors.[42]  Further, the depreciation in the Edmunds rate for

the first years is not applicable to year 6 because depreciation slows considerably.[43]  Thus, the

better proxy for older model vehicles is the mileage rate with much lower depreciation (red

bars) on Exhibit 5.  The overwhelming majority, 76.9%, of vehicles listed by Pals in the Vehicle

data were model year 2018 or older and 40% were model year 2013 or older.  Thus, these older

vehicles would have their expenses better approximated without or with a greatly reduced

estimate for depreciation.  In addition to the variation observed in the costs across model year, it

is worth noting that many of the cost to own estimates after excluding depreciation are also

below the 45 cents per mile rate paid to Pals by Papa.

---

[42] "A general car depreciation calculator works from a car's initial value and shows a dollar amount and percentage of depreciation over time. You'll easily find many such tools online. Edmunds, however, uses a more sophisticated approach in determining depreciation. Edmunds analysts calculate total depreciation by taking the new car's current market value and subtracting the estimated yearly future resale value of the vehicle. Edmunds bases its estimated future resale values on these input factors: Recent auction and retail transaction data of current and older model years; Supply and demand; New vehicle pricing and incentives; New vehicle redesign or improvement info; Vehicle competitive segment; Forecast of the economy." https://www.edmunds.com/tco.html

[43] Under the FAQs section of the True-Cost-to-Own calculator it states for the prompt, how much does a vehicle depreciate in a year? "Different vehicles depreciate at different rates. In general, new cars lose 23.5% of their manufacturer's suggested retail price (MSRP) after a year and about 60% of their MSRP in the first five years. The percentage of depreciation tapers off in subsequent years." See https://www.edmunds.com/tco.html

1

2 **Exhibit 5:  Edmunds True Cost to Own Data Shows Variation in the Costs to Operate**

3 **Various Model Years for a Toyota Camry**[44]

4



19 32.      Exhibit 6 presents the per-mile cost to own a variety of 2018 model year sedans both

20 with and without depreciation, as well as a line representing the IRS mileage rate in 2018 at 55

21 cents per mile.[45]  As demonstrated by the example vehicles on this exhibit, even holding

22 geography, model year and vehicle type ("Sedan") constant, simply using a single estimate to

23 compute Pals' vehicle expenses will not accurately approximate the true cost of operating their

24 vehicles.  As an example, the expense per mile estimates for the sedans including depreciation

25 considered in Exhibit 6 vary from a low of 49 cents per mile for a Toyota Corolla to a high of

26 [44] These estimates exclude estimated finance charges. The IRS rate changed on July 1, 2022, so
the annual average is shown.

27 [45] While 2017 was the most common vehicle year recorded in the data, 2018 is the oldest model
year available on Edmunds.com and was the second most common model year recorded.  2018

28 reflects the lowest IRS rate in effect during the relevant period in this matter.  Again, zip code
95694 was used.  This is not an exhaustive list of sedans listed in the vehicle data.

54.8 cents per mile for a Honda Accord, an approximate 5 cents per mile range.  Excluding depreciation, the estimate per mile costs range from 39 cents for a Toyota Prius to a high of 45 cents per mile for a Honda Accord, Kia Optima or Nissan Altima, an approximate 7 cents per mile range.  Exhibit 6 shows that for these selected vehicles, all of the estimated costs fall below the IRS rate of 55 cents per mile whether including or excluding depreciation. As noted above, values excluding depreciation will more accurately reflect the cost to own older model vehicles.  Additionally, all of the rates for these selected vehicles fall at or below the 45 cents per mile rate paid to Pals by Papa, after excluding depreciation.  Finally, the variation in costs observed on Exhibits 5 and 6 and discussion above regarding depreciation demonstrate that determining the actual expenses incurred by Pals would likely require individualized inquiry to determine 1) Which vehicle was being used when incomplete information was provided to Papa;  2) Which vehicle was in use during which visit for those with multiple vehicles listed in the data and 3) An appropriate measure for depreciation and costs to operate for each vehicle used in conducting visits.

**Exhibit 6: Edmunds Cost to Own Data Shows Variation in the Costs to Operate Various Model Year 2018 Vehicles**[46]



VI. **HOURS WORKED**

A. **The data demonstrates variation in the types of tasks performed by Pals**

33.      The data indicates that Pals perform 12 categories of tasks in connection with visits to Papa members. Exhibit 7 presents a frequency distribution of the scheduled task types. As shown on Exhibit 7, Companionship was the most frequently scheduled task (63.48%), followed

---

[46] These estimates exclude estimated finance charges.

by House Tasks (15.10%) and then Reminders (12.02%).[47]  Exhibit 7 also presents which tasks are identified as having a Vehicle Required (orange bars – Dr. Visits, Grocery Shopping, Medication RX, Run Errands, and Transportation).

**Exhibit 7:  Frequency Distribution of the Scheduled Task Types**



34.      A visit can contain more than one task type.  For example, a visit may include both Companionship and Grocery Shopping.  Exhibit 8 presents a frequency distribution of the number of tasks for a given scheduled visit.  As shown on Exhibit 8, 31.56% of visits have one schedule task type meaning that 68.44% of visits have two or more scheduled task types.

---

[47] A visit can contain more than one task so a single visit could be reflected multiple times in this Exhibit.

**Exhibit 8:  Frequency Distribution of the Scheduled Task Types**



35.      Under each task type, there are various objectives that can be identified.  For example, under the task type "Companionship", there are 230 specific objectives that can be selected. Exhibits 9 through 19 present the frequency distribution for the most frequently recorded objectives under each of the 11 task type categories where objectives other than "Blank" were recorded.[48]

---

[48] Blank is an option that frequently appears in the top 10 for each task type category.  The only objective recorded under the "Medication/RX" task type is "Blank".



**Exhibit 9: Frequency Distribution of the Top 10 of 230 Objectives for Companionship Tasks**



**Exhibit 10: Frequency Distribution of the Top 10 of 60 Objectives for House Tasks**

DECLARATION OF ALISON T. ROSE

**Exhibit 11: Frequency Distribution of the Top 10 of 62 Objectives for Reminders Tasks**

Declaration of Alison T. Rose

**Exhibit 12: Frequency Distribution of the Top 10 of 31 Objectives for Tech Help Tasks**



DECLARATION OF ALISON T. ROSE

**Exhibit 13: Frequency Distribution of the Top 10 of 32 Objectives for Transportation Tasks**



DECLARATION OF ALISON T. ROSE



**Exhibit 14: Frequency Distribution of the Top 10 of 31 Objectives for Dr. Visit Tasks**

DECLARATION OF ALISON T. ROSE

**Exhibit 15: Frequency Distribution of the Top 10 of 15 Objectives for Grocery Tasks**

Percentage of Scheduled "Grocery Shopping" Tasks

| Objective Description | Percentage |
| --- | --- |
| Drive Member to the grocery store | 30.30% |
| Blank | 27.05% |
| Assist with food/grocery shopping | 21.44% |
| Assist with loading / unloading groceries | 12.06% |
| Load groceries in the car | 3.17% |
| Contactless drop off groceries to member | 2.86% |
| Shop together | 0.91% |
| Compile grocery list | 0.86% |
| Drive member to food bank or food pantry | 0.47% |
| Encourage healthy eating | 0.31% |

Objective Description

33

**Exhibit 16: Frequency Distribution of the Top 10 of 24 Objectives for Run Errands Tasks**

DECLARATION OF ALISON T. ROSE



**Exhibit 17: Frequency Distribution of the 9 Objectives for Exercise Tasks**

35

**Exhibit 18: Frequency Distribution of the Top 10 of 12 Objectives for Pet Help Tasks**

Bar chart showing Percentage of Scheduled "Pet Help" Tasks (y-axis, 0% to 100%) vs Objective Description (x-axis):

- Blank: 56.31%
- Take member's pet for a walk: 20.39%
- Feed the member's pet: 9.16%
- Pick up pet (general): 5.05%
- Take member to the dog park: 2.92%
- Take member's pet to the vet: 2.12%
- Feed the Member's dog: 1.66%
- Take pet to the groomers: 0.86%
- Give Member's dog a bath: 0.53%
- Take dog to the vet: 0.46%

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Exhibit 19: Frequency Distribution of the 8 Objectives for Childcare Tasks**

DECLARATION OF ALISON T. ROSE

## B. The data shows that most Pals complete very few visits

36. Generally, the Pals completed very few visits during the relevant period. Exhibit 20 presents the frequency distribution of the number of visits completed by Pals and shows that 52.5% of Pals completed five or fewer visits, 36.6% completed two or fewer visits and 24.1% completed only a single visit. Based on these visit counts combined with the fact that 30 minutes is the most commonly scheduled visit duration (See Exhibit 21), it is very likely that many or even the majority of Pals would not be expected to incur overtime hours or be eligible for meal and/or rest breaks.

**Exhibit 20: Frequency Distribution of the Number of Completed Visits Per Pal**



DECLARATION OF ALISON T. ROSE

**C.**     **The data shows that not all scheduled visits were started and Pals did not record an end time for all started visits**

37.     Plaintiffs have failed to identify a methodology in order to identify all work-related tasks or to compute total hours worked.  However, it is likely that they would intend to rely, in part, on the time stamps recorded in the Papa Visits data regarding actual visit start and end times.  It is worth noting however, that 13.8% of scheduled visits show no indication that the visit was ever started and more importantly, 24.4% of visits have incomplete time stamps, almost always due to a missing end time.  For these 62,265 visits, it appears that Papa credits them with some duration or ends the visit after a certain amount of time, called an override.  Thus, for nearly a quarter of the visits, determining the actual visit duration would likely require additional, individualized information.

**D.**     **Comparison of the Scheduled to Actual Durations indicate that scheduled time does not reliably reflect actual visit durations.**

38.     The visits data includes the scheduled duration for the visit, typically reflecting a value of 30, 60, 120, 180 or 240 minutes.  Exhibit 21 presents a frequency distribution of the scheduled times for completed visits.  As shown on Exhibit 21, nearly 44% of all visits are scheduled for 30 minutes with the second most frequent scheduled duration being 120 minutes for 31.5% of visits.

**Exhibit 21: Frequency Distribution of the Scheduled Duration Minutes for Completed Visits**



39.     It would not be unreasonable to expect that Plaintiffs could argue that scheduled duration could be used as a proxy for actual duration when the visit data is incomplete as to the actual end time of the visit. However, a comparison of the actual durations to scheduled durations show that scheduled duration does not accurately reflect the actual duration for many visits. Exhibits 22 through 26 present the distribution of actual durations for completed visits with recorded start and end times by scheduled duration. For example, Exhibit 22 presents the distribution of actual visit durations for visits scheduled for 30 minutes. As shown on Exhibit 22, more than half of visits scheduled for 30 minutes finish in less than the scheduled time, with many being completed in 5 to 10 minutes. On each of these exhibits, the data suggests that assuming scheduled time for visits where the time stamps are incomplete would likely lead to incorrect conclusions regarding the true visit duration. Overall, 60.5% of visits with recorded

start and end times indicate an actual duration more than 10 minutes from the scheduled duration (e.g. a 30-minute scheduled visit would be included in this percentage if the actual duration was less than or equal to 20 minutes or more than or equal to 40 minutes) and 50.6% reflect an actual duration that is more than 15 minutes from the scheduled duration (e.g. a 30-minute scheduled visit that is completed in 15 minutes or less or is completed in 45 minutes or more).

**Exhibit 22: Frequency Distribution of the Actual Visit Duration for Visits Scheduled for 30 minutes**



DECLARATION OF ALISON T. ROSE

**Exhibit 23: Frequency Distribution of the Actual Visit Duration for Visits Scheduled for 60 minutes**

**Exhibit 24:  Frequency Distribution of the Actual Visit Duration for Visits Scheduled for 120 minutes**



**Exhibit 25: Frequency Distribution of the Actual Visit Duration for Visits Scheduled for 180 minutes**

**Exhibit 26: Frequency Distribution of the Actual Visit Duration for Visits Scheduled for 240 minutes**



**E.** **The data demonstrates that many Pals are unlikely to have worked overtime hours, either on a daily or weekly basis**

40. While there are issues with assessing actual visit time as noted above, an analysis of hours worked for weeks with complete visit time stamps recorded shows that many Pals are unlikely to have worked overtime hours either on a daily or weekly basis, and were also unlikely to be eligible for a meal or rest break. Limiting the data to those weeks where start and end time stamps are completed for every visit leaves 25,371 weeks including 47,359 days for 3,358 Pals and includes 75,579 visits.[49] Exhibit 27 below presents summary statistics regarding the total "in visit" hours recorded in the data for these weeks and shows that the overwhelming majority of

---

[49] A week is defined as Sunday at 12:00AM to Saturday at 11:59:59PM.

days do not achieve the threshold for rest or meal break eligibility or daily overtime and nearly all weeks fall short of the 40 hour threshold for weekly overtime.

**Exhibit 27:   Summary of Daily and Weekly Hours Worked for Weeks with Complete Time Stamps**

| Time Considered | Category | Count | Percent |
|---|---|---|---|
| **Scheduled Duration** | Days with <=3.5 Hours Worked | 36,122 | 76.27% |
| | Days with <=5.0 Hours Worked | 45,450 | 95.97% |
| | Days with <=8.0 Hours Worked | 47,075 | 99.40% |
| | Days | 47,359 | - |
| | Weeks with <=40.0 Hours Worked | 25,334 | 99.85% |
| | Weeks | 25,371 | - |
| **Calculated Duration from Started At and Completed At Time Stamps** | Days with <=3.5 Hours Worked | 36,900 | 77.92% |
| | Days with <=5.0 Hours Worked | 44,682 | 94.35% |
| | Days with <=8.0 Hours Worked | 47,030 | 99.31% |
| | Days | 47,359 | |
| | Weeks with <=40.0 Hours Worked | 25,312 | 99.77% |
| | Weeks | 25,371 | - |

41.      Exhibit 28 presents a summary by Pal and shows that the majority of Pals, 55.7%, never have a day with more than 3.5 hours of visit time recorded, nearly 78% never have a day with more than 5 hours of visit time recorded, and 95% never have a day with more than 8 hours of visit time recorded.  On a weekly basis, more than 98% of Pals never have a week with more than 40 hours of visit time recorded.

**Exhibit 28:   Summary of Daily and Weekly Hours Worked for Weeks with Complete Time Stamps by Pal**

| Time Considered | Category | Count of Pals | Percent of Pals |
|---|---|---|---|
| **Scheduled Duration** | Never has Day with 3.5+ Hours Worked | 1,878 | 55.93% |
| | Never has Day with 5.0+ Hours Worked | 2,932 | 87.31% |
| | Never has Day with 8.0+ Hours Worked | 3,312 | 98.63% |
| | Never has Week with 40.0+ Hours Worked | 3,347 | 99.67% |
| **Calculated Duration from Started At and Completed At Time Stamps** | Never has Day with 3.5+ Hours Worked | 1,870 | 55.69% |
| | Never has Day with 5.0+ Hours Worked | 2,614 | 77.84% |
| | Never has Day with 8.0+ Hours Worked | 3,191 | 95.03% |
| | Never has Week with 40.0+ Hours Worked | 3,303 | 98.36% |
| **Total Number Pals Considered** | | 3,358 | - |

### F.        The available data likely does not include information sufficient to estimate all work-related activities alleged by Plaintiffs

42.        While they have not provided a comprehensive list of activities they allege are work-related, Plaintiffs allege that Pals conducted work-related activities that may not be included in the timestamps recorded in the Papa app, either in the visits or app data.  With regard to activities noted outside of a visit but recorded in the app, the app data does not contain a start and end time stamp, only a single time stamp thus, not permitting a duration to be simply computed.  Additionally, there is no data that I am aware of to indicate the frequency or duration of any activities Plaintiffs allege that Pals were required to participate in outside of the app entirely, (e.g. onboarding and training).  In their Motion for Class Certification, they have not proposed a methodology by which they intend to collect information on the frequency and duration of these tasks nor have they presented any information or analysis to demonstrate that the frequency and duration of these tasks did not meaningfully vary across Pals.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed on September 30, 2024 in Chicago, Illinois.

Alison T. Rose

**List of Data and Documents Relied Upon**

- Third Amended Collective and Class Action Complaint against Papa, Inc.

- First Motion to Certify Class filed by Jennifer Pardo

- Declaration of Plaintiff Evangeline Matthews in Support of Motion for Class Certification

- Declaration of Plaintiff Jennifer Pardo in Support of Motion for Class Certification

- Declaration of Jonathan M. Lebe in Support of Plaintiffs' Motion for Class Certification including Exhibits 1-24

- Proposed Order Granting Plaintiffs' Motion for Class Certification

- Deposition of Evangeline Matthews including Exhibits 1-10

- Deposition of Jennifer Pardo including Exhibits 1-7

- Declaration of Priscilla Hoyta

- Declaration of Kellie Hynds

- Declaration of Sandra Rodriguez

- Declaration of Nancy Gonzalez

- Declaration of Zerina Gacanovic

- Declaration of Cassie Kings

- Declaration of Jennifer Martin

- Declaration of Marsi Haney

- California Pals List ("redwoods_california_pals_list.csv", "redwoods_california_pals_list.sql")

- California Vehicle Data ("redwoods_pal_vehicle_data.csv", "redwoods_pal_vehicle_data.sql")

- Task Data ("redwoods_task_data_for_xp_witness.csv", "redwoods_task_data_for_xp_witness.sql")

49

- Visit Data ("redwoods_visit_data_for_xp_witness.csv", "redwoods_visit_data_for_xp_witness.sql")

- App Data ("redwoods_app_data_for_xp_witness.csv", "redwoods_app_data_for_xp_witness.sql")



111 South Wacker Drive
Suite 3340
Chicago, IL 60606
Office.312.626.2749
Fax.312.626.2730
ARose@resecon.com

# ALISON T. ROSE, PARTNER

Alison Rose is a Partner in the litigation consulting practice of Resolution Economics LLC. She has a Bachelor's Degree and Master's Degree in Economics from the University of Southern California and a Master's Degree in Survey Research from the University of Connecticut. Ms. Rose has significant experience in analyzing complex data for the purpose of assisting counsel in evaluating class certification and liability. She has extensive experience in employment related litigation support, including preparation of economic and statistical analysis in class action matters involving wage and hour disputes, often involving large and complex databases. Ms. Rose has also provided litigation support for matters involving allegations of race, gender, and age discrimination in a variety of industries. She has assisted counsel at numerous mediations and has served as an expert in several matters.

## Professional Experience

Ms. Rose has considerable experience in providing economic and/or statistical analyses related to employment litigation matters. Also, she performs general damages analyses, forensic accounting, and statistical analyses in a broad range of matters involving commercial damages and contract disputes. In addition, Ms. Rose has considerable expertise in financial modeling, creating large databases from paper records and diverse data sources, and conducting statistical analyses related to complex data intensive litigation assignments.

## Class Action Wage and Hour Claims

Ms. Rose has been involved in many class action wage and hour matters. She is highly experienced in analyzing liability, damages, and issues related to class certification in matters involving wage and hour claims. She is experienced in designing, implementing, and performing forensic data analyses related to job content, exempt/non-exempt status, independent contractor/employee status, hours worked, uncompensated time, meal and rest breaks, improper pay calculations, and other issues. Finally, Ms. Rose has significant experience in assisting counsel at mediation where she has presented findings related to class certification and merits issues, evaluation of economic exposure under a variety of legal theories, and has also assisted counsel in structuring the settlement terms. Assignments representative of Ms. Rose's wage and hour experience include:

- Consulting services to defense counsel in large multi-plaintiff matter alleging misclassification of managers at a large nationwide office-supply retailer. Services included performing statistical analysis of survey data related to a variety of class certification issues and statistical analysis of observation study data related to establishing liability.

- Consulting services to defense counsel in large multi-plaintiff matter alleging misclassification of managers at a nationwide general retailer. Services included performing statistical analysis of survey and observation study data related to a variety of class certification issues.



- Consulting services to defense counsel in multi-plaintiff matter alleging misclassification of call-center employees as exempt. Services included estimating damages related to unpaid overtime, missed meal and rest periods, and waiting time penalties in accordance with California law.

- Consulting services to defense counsel in multi-plaintiff matter alleging misclassification of retail store employees as exempt. Services included estimating damages related to unpaid overtime, missed meal and rest periods, and waiting time penalties in accordance with California law.

- Consulting services to defense counsel in multi-plaintiff matter brought by employees at a restaurant chain alleging failure to provide meal and rest breaks. Services included analyzing timekeeping and payroll records related to class certification. Assisted counsel at mediation.

- Consulting services to defense counsel in multi-plaintiff matter brought by employees at an emergency relief call-center alleging incorrect payment for overtime worked, late payments, and missed meal and rest periods. Services included analyzing time records and calculating overtime owed based on California law, estimating the number of missed meal and rest periods, and estimating exposure.

- Consulting services to plaintiff counsel in multi-plaintiff action brought by pilots alleging improper payment and calculation of seniority during military leave. Services included analyzing large human resource databases in order to analyze defendant's damages calculation.

- Consulting services to defense counsel in multi-plaintiff matter brought by union employees at an oil refinery company alleging missed meal and rest breaks, uncompensated hours, and improper calculation of overtime hours. Services included analyzing human resources, compensation, and timekeeping data related to class certification and calculating exposure for use at mediation.

- Consulting services to defense counsel in large multi-plaintiff matter brought by independent contractors alleging misclassification related to contracts with a large nationwide parcel pick-up and delivery company. Services included performing statistical analysis related to a variety of class certification issues and business model valuation.

- Consulting services to defense counsel in several large multi-plaintiff matters brought by service and installation technicians at a cable installation contractor alleging failure to pay overtime. Services included analyzing installation and service records, compensation and timekeeping data, employee declarations, and depositions related to class certification. Services also included responding to analysis performed by plaintiffs' expert.

- Consulting services to defense counsel in multi-plaintiff matter brought by independent contractors alleging misclassification related to contracts with an appliance delivery and installation company. Services included performing statistical analysis related to a variety of class certification issues and business model valuation.

- Consulting services to defense counsel in a wage and hour matter alleging store managers at a chain of convenience stores were misclassified. Services included assisting counsel in estimating exposure based on a variety of legal theories for mediation.



- Consulting services to defense counsel in a wage and hour matter brought by employees working in the healthcare industry alleging misclassification. Services including performing statistical analysis of timekeeping, payroll, cell phone, and other business records related to class certification issues. Services also included estimating exposure under a variety of legal theories and assisting counsel at mediation.

- Consulting services to defense counsel in a class action wage and hour matter alleging that engineers were misclassified as exempt workers by a technology firm. Analyzed compensation, security badge, and computer log-in data and assisted counsel in developing approaches to class certification.

- Consulting services to defense counsel in a class action matter brought by employees at a nationwide restaurant chain alleging off-the-clock work. Analyzed timekeeping and compensation data related to class certification and assisted counsel at mediation.

- Consulting services to defense counsel in a matter alleging that a class of several hundred independent contractors was misclassified. Services included designing a sampling scheme, building and analyzing a database of business expenses, analyzing the business model, and performing business valuations related to a number of businesses.

- Consulting services to defense counsel in a multi-district class action matter alleging that independent contractors in the package delivery business were misclassified employees. Services included analyzing the business model, conducting a variety of surveys, and responding to the class certification report of plaintiffs' expert.

- Consulting services to defense counsel in a wage and hour matter brought by employees at a nationwide convenience store alleging improper payroll deductions related to the use of pay cards. Services included analyzing compensation data related to class certification.

- Consulting services to defense counsel in a wage and hour matter brought by employees working in the hospitality industry alleging off-the-clock work and failure to provide meal and rest breaks. Services included analyzing timekeeping and compensation data related to class certification.

- Consulting services to defense counsel in a class action matter brought by employees at a satellite television service and installation contractor alleging failure to pay overtime. Services included analyzing service and installation data and compensation data related to class certification. Assisted counsel at mediation.

- Consulting services to defense counsel in a class action matter brought by employees at a clothing retailer alleging that they were improperly compensated for overtime hours due to failure to incorporate bonuses into the regular rate of pay and were denied meals and rest periods. Services included analyzing timekeeping and compensation data, assisting counsel in developing approaches to class certification, and assisting counsel at mediation.

- Consulting services to defense counsel in a class action matter brought by union employees at a liquor and wine distribution company alleging improper expense reimbursements. Services included analyzing expense reimbursements, mileage reimbursements, and publicly available data on vehicle depreciation related to class certification.



## Employment Damages Analysis

Ms. Rose has assisted counsel in estimating employment-related economic damages in several matters. She has expertise in evaluating but-for earnings, job search efforts, and mitigation opportunities. Assignments representative of Ms. Rose's experience estimating economic damages include the following:

- Consulting services to plaintiff counsel in single-plaintiff matter alleging wrongful termination and failure to pay wages. Services included creating economic models to estimate economic damages under a variety of career path and retirement scenarios.

- Consulting services to defense counsel in numerous matters alleging wrongful termination in the pick-up and delivery industry. Services included creating models to estimate economic damages and analyzing mitigation opportunities.

- Consulting services to defense counsel in single-plaintiff matter alleging wrongful termination in the construction industry. Services included creating models to estimate economic damages, analyzing mitigation opportunities and various retirement scenarios.

- Consulting services to defense counsel in single-plaintiff matter alleging wrongful termination at a server installation and maintenance firm. Services included creating models to estimate economic damages, examining job search efforts, and analyzing mitigation opportunities.

- Consulting services to defense counsel in single-plaintiff matter alleging wrongful termination in the construction industry. Services included creating models to estimate economic damages under various scenarios, examining job search efforts, and analyzing mitigation opportunities.

## Employment Discrimination Liability Analysis

Ms. Rose has performed numerous statistical analyses of liability related to class action claims of employment discrimination. She is experienced at analyzing claims alleging discrimination in hiring, promotion, placement, termination, discipline, and pay equity. Assignments representative of Ms. Rose's experience in employment discrimination include the following:

- Consulting services to defense counsel in a class-action matter brought by the EEOC alleging age discrimination in terminations at a major pharmaceutical company. Services included building analytical databases from multiple sources of information, performing statistical analysis related to the discrimination claim, and estimating economic exposure.

- Consulting services to in-house counsel in connection with a reduction in force at a major banking institution. Tested various reductions in force scenarios for statistical significance. Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Consulting services to defense counsel in a large national class action employment dispute alleging gender discrimination at a nationwide warehouse style retailer. Performed SAS programming and statistical



analyses related to hiring, initial placement, and initial pay of applicants. Performed statistical analyses of female availability in the external labor market.

- Consulting services to defense counsel in a single plaintiff action alleging age discrimination by a large international food company. Performed SAS programming and statistical analysis of terminations. Analyzed the work product of opposing expert. Assisted in drafting questions for use at deposition.

- Consulting services to defense counsel in a class action matter alleging race discrimination in the legal department at a construction equipment company. Performed statistical analysis related to promotions.

- Consulting services to outside counsel in connection to performing statistical analysis of proposed workforce reductions at a technology company who produces semiconductors. Tested various reductions in force scenarios for statistical significance. Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Consulting services to defense counsel in a wrongful termination matter alleging race discrimination at a financial services institution. Analyzed networking opportunities, account distribution practices, and other pay data.

- Consulting services to defense counsel in class action matter brought by the EEOC alleging gender discrimination at a warehouse style home and garden retailer. Performed SAS programming and statistical analyses related to hiring, initial placement, and initial pay of applicants.

- Consulting services to outside counsel in connection with a reduction in force in the IT department at a financial institution. Tested various reductions in force scenarios for statistical significance. Assisted counsel in creating a RIF plan that avoided adverse impact on protected classes.

- Consulting services to defense counsel in a class action matter alleging age discrimination at a nationwide communications company. Performed statistical analysis related to hiring, promotion, and termination.

- Consulting services to defense counsel in a wrongful termination matter alleging gender discrimination at a financial services institution. Analyzed account distribution outcomes, pay equity, and terminations.

- Consulting services to defense counsel in a class action matter alleging age discrimination at a major law firm. Performed statistical analysis related to promotion and termination.



## Forensic Accounting/Commercial Damages

Assignments representative of Ms. Rose's experience related to analysis of disputes involving commercial damages:

- Consulting services to defense counsel in a breach of contract matter in the plumbing materials industry. Services included analyzing financial records, estimating damages, and responding to the opposing expert's report. Assisted counsel in drafting questions for use at opposing expert's deposition.

- Consulting services to defense counsel in class-action matter where the underlying issues were allegations of fraudulent pricing and delivery practices at a major gasoline distribution company. Services included creating a sampling methodology for analyzing data, processing paper documents into an analytical database, and analyzing pricing and delivery outcomes.

- Consulting services to defense counsel in matter against a California city alleging failure to pay for services rendered by a private tax collection company. Services included collecting and analyzing tax data, collection activities, and payment information to assess economic damages. Assisted counsel at mediation.

## Education

**University of Connecticut**
Master of Arts, Survey Research

**University of Southern California**
Master of Arts, Economics

**University of Southern California**
Bachelor of Arts, Economics

## Employment History

**Resolution Economics LLC**
      2004–Present: Partner, Director, Senior Manager, Manager, Senior Consultant, Consultant

# Alison T. Rose, MA
# Attachment to Resume

## TESTIMONY AND AFFIDAVITS PRESENTED

In the matter of <u>Turrow/McParlane Associates v. City of Los Angeles</u>, Case No.: BC 372898, related to analysis of economic losses. Report filed August 12, 2008.

In the matter of <u>Dorsette, et al v. Travel Centers of America, LLC</u>, Case No.: CIVRS 0905859, related to analysis of economic losses. Declaration in support of Defendant's Notice of Removal filed July 16, 2009.

In the matter of <u>Noll, et al v. Travel Centers of America, LLC</u>, Case No.: EDCV-10-0589 VAP (AJWx), related to analysis of economic losses. Declaration in support of Defendant's Opposition to Plaintiffs' Motion for Remand filed May 17, 2010.

In the matter of <u>Leal, et al v. Wyndham Worldwide, Corp.</u>, Case No.: 37-2009-00084708-CU-OE-CTL, related to the calculation of hourly rates of pay. Report filed August 25, 2010.

In the matter of <u>McCullough v. Lennar Corporation</u>, Case No.: 09-CV-1808 WQH (BGS), related to analysis of economic losses. Report filed September 2, 2010.

In the matter of <u>Armstrong v. Advanced Technology Distributors, Inc.</u>, Case No.: 1:09-cv-01901-LJO-DLB, related to analysis of economic losses. Report filed September 3, 2010.

In the matter of <u>Coover, Valdivia, and Davis, et al v. Families First, Inc.</u>, Case No.: 108-CV-125124, related to class certification. Reports filed July 5, 2011 and July 19, 2011.

In the matter of <u>Perez, et al v. Saks & Company</u>, Case No.: CGC-14-538900, related to analysis of economic losses, Declarations in support of Defendant's Notice of Removal filed May 30, 2014, June 26, 2014, and July 11, 2014.

In the matter of <u>Derum, et al v. Saks & Company</u>, Case No.: 37-2014-00023419-CU-OE-CTL, related to analysis of economic losses. Declaration in support of Defendant's Notice of Removal filed August 14, 2014.

In the matter of <u>Robinson, et al v. The Chef's Warehouse, Inc.</u>, Case No.: 15-cv-05421, related to class certification. Report filed October 5, 2017.

In the matter of <u>CRST Expedited, Inc. v. TransAm Trucking, Inc.</u>, Case No.: 1:16-CV-00052-LTS related to analysis of lost profits and calculation of rates of pay.  Declaration filed January 3, 2018.

In the matter of <u>McLeod, et al. v. Ralphs Grocery Company</u>, Case No.: BC321704, related to the calculation of PAGA penalties.  Declaration filed April 27, 2018.

In the matter of <u>Fox, et al. v. TransAm Leasing, Inc.</u>, Case No.: 2:12-cv-02706-JTM-GLR related to analysis of economic loss and review of Plaintiffs' expert's report.  Declaration filed June 5, 2018.

In the matter of <u>LaFace, et al. v. Ralphs Grocery Company</u>, Case No.: BC632679 related to the calculation of PAGA penalties.  Deposition testimony May 7, 2019.

In the matter of <u>Hedrick, et al. v. BNC National Bank</u>, AAA Case No: 01-16-0002-2371 related to analysis of wage and hour allegations.  Report filed June 30, 2019.

In the matter of <u>Omelet v. Parts Authority, LLC</u>, AAA Case No. 01-20-0003-8239 related to analysis of mileage expenses and minimum wage.  Report filed December 11, 2020.  Arbitration testimony given January 26, 2021.

In the matter of <u>Loaiza, et al. v. Kinkisharyo International LLC</u> Case No.: 2:19-cv-07662 related to class certification and review of Plaintiffs' expert report.  Declarations filed January 13, 2021 and March 10, 2023.

In the matter of <u>Armendariz, et al. v. Kinkisharyo International LLC</u> Case No.: 19STCV32237 related to class certification and review of Plaintiff's expert report.  Declaration filed January 13, 2021.

In the matter of <u>Morse v. Parts Authority, LLC.</u> AAA Case No.:01-20-0003-8372 related to analysis of minimum wage and mileage expenses.  Arbitration testimony given January 19, 2021.

In the matter of <u>DeBaker v. Route 41 Pizza, LLC.</u> AAA Case No.:01-20-0015-3472 related to analysis of minimum wage and mileage expenses.  Report filed January 26, 2021.

In the matter of <u>Montierth v. Parts Authority, LLC.</u> AAA Case No.:01-20-0009-6228 related to analysis of minimum wage and mileage expenses.  Arbitration testimony given March 2, 2021.

In the matter of <u>Pannell v. Parts Authority, LLC.</u> AAA Case No.:01-20-0009-6223 related to analysis of minimum wage and mileage expenses.  Arbitration testimony given March 16, 2021.

In the matter of <u>Mooney v. Domino's Pizza, LLC</u>, AAA Case No.: 01-20-0005-4266 related to analysis of minimum wage, mileage expenses and review of Claimants' expert's report.  Report filed May 3, 2021.

resolution economics LLC

In the matter of <u>Flynn v. Domino's Pizza, LLC</u>, AAA Case No.: 01-20-0000-5512 related to analysis of minimum wage, mileage expenses and review of Claimants' expert's report.  Report filed May 3, 2021.

In the matter of <u>Knight v. Carpe Diem Pizza, Inc.</u>, AAA Case No.: 01-21-0002-7614 related to analysis of mileage expenses.  Report filed September 27, 2021.

In the matter of <u>Graves v. Carpe Diem Pizza, Inc.</u>, AAA Case No: 01-21-0002-6820 related to analysis of mileage expenses.  Report filed October 15, 2021.

In the matter of <u>Magnuson v. Exelon Corporation,</u> Case No: 4:21-cv-04142-SLD-JEH related to analysis of economic losses.  Report filed August 1, 2022.  Rebuttal report to Plaintiff's expert filed September 19, 2022.  Deposition testimony December 19, 2022.

In the matter of <u>Alveranga v. Carpe Diem Pizza, Inc.</u>, AAA Case No: 01-22-0000-6202 related to analysis of mileage expenses.  Report filed November 17, 2022.  Deposition testimony December 15, 2022.

In the matter of <u>Guzman, et al v. Walmart, Inc.</u>, Case No. 5:21-cv-09133-NC related to class certification and analysis of Plaintiffs' expert's report.  Report filed April 6, 2023.

In the matter of <u>Fogo de Chao Wage and Hour Cases</u>, Judicial Counsel Coordination Proceeding No. 5034, Lead Case No.: 17CV318072 related to class certification and analysis of Plaintiffs' experts' reports.  Reports filed April 17, 2023 and March 20, 2024.  Deposition testimony May 26, 2023.

In the matter of <u>Picetti, et al v. Stryker Corporation, et al</u>, related to analysis of economic losses.  Declaration in support of Defendant's Notice of Removal filed July 10, 2023.

In the matter of <u>Hernandez, et. al. v. Walmart Associates, Inc.</u>, Case No: 5:21-cv-00166-FLA (KKx), related to analysis of timekeeping records.  Declaration filed August 3, 2023.

In the matter of <u>Castellon, et al v. Walmart Associates, Inc.</u>, Case No. 2:23-cv-7547 AB (KKx), related to analysis of timekeeping data.  Declaration filed September 7, 2023.

In the matter of <u>Palomo v. GMRG ACQ1, LLC</u>, AAA Case No: 01-22-0004-7815, related to analysis of mileage expenses.  Report filed October 6, 2023.  Arbitration testimony given March 28, 2024.

In the matter of <u>Shimizu v. Walmart, Inc.</u>, related to analysis of timekeeping records.  Declarations filed October 9, 2023 and November 24, 2023.

resolution economics LLC

In the matter of <u>Holloway v. Apex Pizza Holdings, LLC</u>, AAA Case, related to analysis of mileage expenses.  Report filed October 26, 2023.

In the matter of <u>Zumaya v. Bam! Pizza Management, Inc.</u>, AAA Case, related to analysis of mileage expenses.  Report filed November 6, 2023.  Arbitration testimony given November 14, 2023.